IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Submitted on Briefs October 1, 2021

## IN RE DIAMOND F. ET AL.

**Appeal from the Circuit Court for Warren County**
**No. 20CV-1250    Larry B. Stanley, Jr., Judge**

_____

**No. M2020-01637-COA-R3-PT**

_____

The Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Brenda F.[1] ("Mother") and David F. ("Father") to their three children who were then minors. As grounds, DCS alleged: (1) abandonment by failure to visit one of the children, Orian F.; (2) abandonment by failure to provide a suitable home for the children; (3) substantial noncompliance with the permanency plans; (4) persistence of the conditions that led to the children's removal; (5) incompetency of the parents to provide care and supervision of the children; and (6) failure to manifest an ability and willingness to assume custody of the children. The trial court found that DCS established all six grounds for termination by clear and convincing evidence, and that termination of parental rights was in the children's best interest. Although the parents have appealed only the ground of abandonment by failure to visit and the trial court's best interest findings, we have reviewed all of the alleged grounds, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and CARMA DENNIS MCGEE, J., joined.

Lauren Zechman-Denney, McMinnville, Tennessee, for the appellant, David F.

Christina S. Stanford, McMinnville, Tennessee, for the appellant, Brenda F.

Herbert H. Slatery III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

_____

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights, in order to protect their privacy and identities.

## OPINION

## I. BACKGROUND

On July 7, 2020, DCS filed the petition to terminate the parents' rights to their three minor children: Diamond (born 12/18/03), Orian (7/10/06), and Edwin (7/5/11). At that time, their two eldest children had already reached adulthood. DCS had received referrals from staff at the children's schools, indicating concern that their medical, dental, nutritional, hygiene, clothing, and mental health needs were not being met. In February and March of 2019, Orian's teachers reported that she was coming to school in dirty clothing, including men's shoes that were too big. Orian, who was then twelve years old, "appeared not to have been bathed for several days," and her hair was "unkempt, greasy, and matted." In class, she was either combative or sleeping so deeply that she urinated on herself in her sleep on several occasions. When the school nurse called Mother to tell her Orian was sick and needed to be picked up, Mother responded that there was no one available to pick her up and said to just send her home on the school bus.

DCS conducted a home visit on March 9, 2019. At that time, twelve people were living in the house. According to the findings of the Warren County Juvenile Court that adjudicated the children to be dependent and neglected,[2] regarding the home visit:

> Both case managers observed Orian to exit the home, running like an ape on all fours, and then proceed to jump from that position onto the hood of a vehicle like a cat. Orian appeared wild-eyed and was making animal noises. Orian was filthy, with dirt covering her clothing, hands, and feet. Orian's hair was still greasy and matted and it appeared that Orian had still not been bathed. Orian's appearance and behaviors are akin to a feral child. . . . Once in the home, both case managers were able to observe all of the children. Edwin appeared to be dirtier than Orian[.]

The trial court further found as follows regarding the parents' domicile at the time:

> During 2018 and 2019, when the parents did live in a home with the children and multiple other people, the living conditions the parents subjected their children to were horrendous. There was limited heat in the home during the winter months. The caseworkers made a home visit during cold weather and found the bedroom the children stayed in had a broken window and was about the same temperature as it was outside. The children were sleeping on mattresses that were covered in filth and feces. The home was filthy with

---

[2] Several documents from the record in the related juvenile court dependency and neglect case were admitted into evidence without objection for the trial court's consideration.

trash and debris on the floors, along with fire hazards through the house. The house had rotten food in the refrigerator.

On March 14, 2019, the juvenile court entered a protective custody order removing the children[3] from the home and placing them in DCS custody. On June 10, 2019, following a hearing, the juvenile court adjudicated the children dependent and neglected, based on its findings of the parents' failure to provide a safe and suitable home; failure to meet the children's medical, hygiene, and clothing needs; lack of supervision; the parents' admitted drug use; and allegations of sexual abuse by Father. The juvenile court also found that DCS had made reasonable efforts to assist the parents in remedying the conditions that necessitated foster care.

The main source of income for the multiple people living in the house was the social security disability checks of Mother and Father's mother and stepfather. Father's mother died in April of 2019. The stepfather moved out with the family's vehicle in the autumn of 2019. Electricity and running water were turned off for the house. The parents continued to live there with their adult children, apparently in denial that the landlord was trying to sell the house. They were evicted in December of 2019. The efforts of DCS to assist the parents in finding affordable housing were unavailing. Mother and Father lived in a tent until around August of 2020, when they began residing in a car.

The trial on the petition to terminate parental rights occurred on October 29, 2020. Both parents testified, as did Julie Brown, a DCS family service caseworker; Nickole Anderson, a case manager who worked with Edwin; Holly W., Edwin's foster parent; and Jeffery Scott Herman, who conducted psychological evaluations and parenting assessments on the parents. The trial court entered an order terminating Mother and Father's parental rights on several grounds.

The parents appealed. Upon a joint motion filed by DCS and the children's guardian ad litem, this Court entered an order remanding this matter to the trial court "for entry of a new order that complies with Tenn. Code Ann. § 36-1-113(k)."[4] Upon remand, the trial court entered an amended order stating, "[t]he finding of abandonment by failure to support was inadvertently included in the court['s] previous order. This ground shall be stricken from the Court's previous ruling." The trial court also held that "[t]he previous order entered in this matter on November 6, 2020, shall be amended to add the following grounds as termination of parental rights: substantial noncompliance with the permanency plans, persistence of conditions and mental incompetence."

---

[3] At that time, the two eldest children, Alex and Breanna, had not yet reached adulthood, and they were also found dependent and neglected, and placed in the custody of DCS.

[4] Tenn. Code Ann. § 36-1-113(k), in pertinent part, requires the trial court to "make[] specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing" to terminate parental rights.

## II. ISSUES

The issues presented are whether the trial court erred in finding, by clear and convincing evidence, that DCS has established the alleged grounds for terminating the parental rights of Mother and Father, and whether the trial court erred in finding termination to be in the best interests of the children.

## III. STANDARD OF REVIEW

As our Supreme Court has explained,

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522-23 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013); *see also* Tenn. Code Ann. § 36-1-113(g). "A party seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *Id.* (citing Tenn. Code Ann. § 36-1-113(c)).

In light of the substantial interests at stake in termination proceedings, the heightened standard of clear and convincing evidence applies. *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769). This heightened burden "minimizes the risk of erroneous governmental interference with fundamental parental rights[,]" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *Id.* (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable,

rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)). Accordingly, the standard of review in termination of parental rights cases is as follows:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.,* 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.,* 319 S.W.3d at 596–97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 523-24. We give considerable deference to a trial court's findings about witness credibility and the weight of oral testimony, as the trial court had the opportunity to see and hear the witnesses. *State Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

## IV. ANALYSIS

We first address the fact that the unusual appellate procedural history of this case has presented an uncommonly challenging situation for the parties and their counsel. After Mother and Father respectively filed their appellate briefs, DCS and the guardian ad litem filed a "joint motion to remand and to stay briefing schedule," supported by an accompanying memorandum in which they argued that

> [t]he circuit court entered a written order terminating parental rights on November 6, 2020. While the order states that the court found all the allegations in the termination petition "to be accurate," the order does not make conclusions of law as to each ground, as required by Tenn. Code Ann.

5

§ 36-1-113(k). For example, the termination petition alleged the grounds of substantial noncompliance with the permanency plans, persistence of conditions, and mental incompetence, which are not addressed in the final order. Further, the final order includes a finding of abandonment by failure to support even though the petition to terminate parental rights did not allege that ground.

(Citations to record omitted). The joint motion further states that "the parties have conferred with counsel for Mother and Father, who do not have a position regarding the motion to remand." This Court granted the motion and remanded the case to the trial court, as already noted.

The failure of the trial court to initially make adequate findings of fact and conclusions of law, and its shifting of the legal posture of the case by "striking" one termination ground and "adding" three others after the appellants' briefs had been filed, places both counsel for Mother and Father in the position of having filed briefs that primarily address an issue that has become moot−whether the trial court erred in finding DCS established that they abandoned the children by failing to support them. However, Mother and Father each had the opportunity to file a reply brief, which they did not. Moreover, had either parent requested an opportunity to address and appeal the additional grounds found by the trial court upon remand, they would certainly have been granted that relief. This is because, among other reasons, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *In re Carrington H.*, 483 S.W.3d at 511.

In *Carrington H.*, the Supreme Court held that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal." *Id.* Consequently, we have fully reviewed every statutory ground for termination found by the trial court, considering any potential argument for error in this case, in order to preserve the parents' rights to a fundamentally fair procedure. We now address the six grounds in turn.

## A. Abandonment by Failure to Visit[5]

The trial court found that the parents "willfully failed to visit Orian . . . for four months immediately preceding the filing of the petition." Tennessee Code Annotated section 36-1-113(g)(1) lists abandonment, as defined in section 36-1-102, as a ground for

---

[5] This ground is only applicable to Orian, as she was the only child found by the trial court to have been abandoned by failure to visit during the applicable time frame.

6

terminating parental rights. At the time the petition was filed, the applicable version of Tenn. Code Ann. § 36-1-102 provided as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> > (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights or adoption, that the parent . . . either ha[s] failed to visit or ha[s] failed to support or ha[s] failed to make reasonable payments toward the support of the child[.]

This ground for termination is established when a parent, "for a period of four (4) consecutive months, [fails] to visit or engage in more than token visitation."[6] Tenn. Code Ann. § 36-1-102(1)(E). A parent may assert the absence of willfulness, which must be proved by a preponderance of the evidence, as an affirmative defense to abandonment by failure to visit. *Id.* § 36-1-102(1)(I). This Court has explained:

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child.

*In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (footnote and citations omitted); *see also In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) ("A parent cannot be said to have abandoned a child when his failure to visit or support is due to circumstances outside his control.").

DCS filed the petition in this case on July 7, 2020, so the pertinent four-month period is March 6 through July 6 of 2020. It is not disputed that neither parent visited Orian during this time. DCS caseworker Julie Brown testified that Orian was then living at Mountain Youth Academy, and that the parents did not visit her during the relevant four months. Ms. Brown stated that the parents were made aware of where Orian had been

---

[6] " '[T]token visitation' means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

placed and how to contact and visit her. In fact, Mother and Father had previously been to Mountain Youth Academy to visit Orian in August of 2019.[7]

The parents thus had the statutory burden of proving by a preponderance of the evidence that their failure to visit was not willful. Tenn. Code Ann. § 36-1-102(1)(I). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.,* 402 S.W.3d at 640. Mother and Father both suggest in their briefs that their limited means make it difficult to visit Orian, but the Tennessee legislature has directly addressed these arguments at Tenn. Code Ann. § 36-1-102(D) by providing "[t]hat the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period."

Furthermore, Ms. Brown testified that the parents were offered gas cards and overnight stays at nearby hotels to help accommodate visitation, and that these "accommodations [were] in place and available during the entire four-month period." Telephonic and videoconferencing visitation was also readily available to the parents. They used these means to visit with their other children during this time period. We affirm the trial court's judgment that DCS proved by clear and convincing evidence that Mother and Father abandoned Orian by failing to visit her during the four months prior to the filing of the petition.

## B. Abandonment by Failure to Provide a Suitable Home

A trial court may also terminate a parent's rights for his or her abandonment through failure to provide a suitable home. Tenn. Code Ann. § 36-1-113(g)(1); § 36-1-102(1)(A)(ii). This form of abandonment occurs when:

(*a*) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

---

[7] Mother visited with her in person, but Father was not allowed in because he did not have the required valid identification documents.

8

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

*Id.* § 36-1-102(1)(A)(ii)(*a*)–(*c*).

A court applying this ground "considers whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). To terminate parental rights under this ground, the trial court must find "that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015). A suitable home requires "'more than a proper physical living location.'" *In re Daniel B. Jr.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home also requires that "[a]ppropriate care and attention be given to the child," *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016), and that the home "be free of drugs and domestic violence," *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014).

DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *In re Matthew T.*, 2016 WL 1621076, at *7. "Reasonable efforts is a fact intensive inquiry and must be examined on a case-by-case basis." *In re Aayden C.*, No. E2020-01221-COA-R3-PT, 2021 WL 2420154, at *7 (Tenn. Ct. App. June 14, 2021) (quoting *In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005)). " 'Reasonable efforts' as defined by the legislature is 'the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family.' " *Id.* (quoting Tenn. Code Ann. § 37-1-166(g)(1)). The Department should utilize its superior resources in assisting a parent to establish a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Hannah H.*, 2014 WL 2587397, at *9 (citing *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008), *overruled on other grounds by In re Kaliyah S.*,

9

455 S.W.3d 533 (Tenn. 2015)); *see also In re Matthew T.*, 2016 WL 1621076, at *7. Although the parent is required to make "reasonable efforts" to establish a suitable home, "successful results" are not required, and the "statute requires that the parent also have demonstrated a lack of concern for the [child]." *In re D.P.M.*, No. M2005-02183-COA-R3-PT, 2006 WL 2589938, at *10 (Tenn. Ct. App. Sept. 8, 2006).

In this case, the evidence in the record fully supports the trial court's determination that DCS "made substantial efforts to [assist] the parents to provide a stable home for the children." Ms. Brown testified that DCS had (1) provided the parents information about scheduling assessments and visitations; (2) scheduled drug and alcohol assessments for the parents; (3) offered transportation to the assessment appointments and other places; (4) provided information to Father about job prospects, and assistance to the parents in creating two budgets for them; (5) referred the parents to churches and other charitable organizations for assistance; (6) completed and mailed applications for housing, Father's disability application, TennCare and other health care providers on the parents' behalf; and (7) offered the parents gas cards and overnight accommodations. DCS also completed and mailed three applications to homeless housing help organizations, and contacted several trailer parks for the parents. Father himself testified that Ms. Brown "has been pretty good to work with" him, and that "she's been very helpful."

Despite this assistance, at the time of trial the parents were residing in their car, after having lived many months in a tent. Both Mother and Father admitted that they have no place for the children to live. We affirm the trial court's judgment terminating parental rights on the ground of abandonment by failure to provide a suitable home for the children.

### C. Substantial Noncompliance with Permanency Plans

Tennessee Code Annotated section 36-1-113(g) provides that parental rights may also be terminated on the ground of "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground cannot be established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed

from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)); *accord* Tenn. Code Ann. § 37-2-403(a)(2)(C) ("Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . . if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement."). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). If the trial court does not make a finding with respect to the reasonableness of the parent's responsibilities under the permanency plan, as in the present case, the reviewing court must review this issue de novo. *See In re Valentine*, 79 S.W.3d at 547.

In this case, three permanent parenting plans were created, on April 3 and September 30 of 2019, and on March 16, 2020. The plans included these responsibilities for both parents: (1) obtain and maintain appropriate housing with working utilities and free of safety hazards, including rodents and insects; (2) complete a psychological and psychosexual evaluation and follow all recommendations; (3) complete an alcohol and drug assessment, follow recommendations, and submit to drug screens; (4) complete a parenting assessment, successfully and completely follow recommendations, and participate in parenting classes; and (5) participate in all visitation with the children. Additionally, Father was required to obtain and maintain a legal means of income, provide verification to DCS monthly, and complete a budget to ensure that income is able to meet the children's needs. Under the circumstances presented here, these responsibilities are reasonable and related to remedying the conditions that necessitated foster care placement.

Both Mother and Father participated in the development of the first and second permanency plans, and agreed to the responsibilities therein. Ms. Brown testified that DCS reviewed the plans with the parents, explained their requirements, and informed them of the potential consequences of noncompliance.

The parents did complete some of their responsibilities. Each of them signed necessary releases of information, completed psychological and parenting assessments, and submitted to at least one drug screen. Mother completed alcohol and drug treatment, but Father did not. Both parents tested positive for marijuana in June of 2020. Each admitted at trial that they still use marijuana occasionally. As found by the trial court in its amended order,

> The parents did not complete the requirements in the permanency plans. The
> parents' noncompliance included: did not maintain safe and stable housing,
> and not following [*sic*] recommendations of their psychological evaluations.
> The father did not complete the recommendations of his alcohol and drug

11

assessment. The father did not complete a psychosexual evaluation. The father did not obtain a legal means of income.

Ms. Brown testified that neither Mother nor Father followed the recommendations resulting from their psychological evaluations. Father's failure to complete a psychosexual evaluation is significant in light of an earlier allegation of his abuse of a child not his own (which Father acknowledged but denied at trial), and Orian's disclosures about Father watching pornography on the family's only television in the living room, and her grandfather walking through the house with no clothes on.

Neither parent has been able or willing to take any significant step, as reasonably required by the permanency plans, down the road toward being able to provide for any of their children's needs. Father refused to cooperate with DCS's efforts to help find him employment. At the time of trial, Father's application for disability assistance, filed at least six months after the children were removed, was still pending. Further, as already noted, the parents' housing situation has continued to deteriorate. They did not comply with the requirement to obtain and maintain stable and safe housing. We affirm the trial court's judgment terminating their parental rights on the ground of substantial noncompliance with the permanency plans.

### (D) Persistence of Conditions

Tennessee Code Annotated section 36-1-113(g) provides that a person's parental rights can be terminated when:

> The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>
> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A). The purpose of the persistent conditions ground "is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016). Consequently, "[t]he failure to remedy the conditions which led to the removal need not be willful." *Id.* (citing *In re T.S. and M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)). Even if not willful, "[a] parent's continued inability to provide fundamental care to a child . . . constitutes a condition which prevents the safe return of the child to the parent's care." *Id.* (citing *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)).

The trial court found as follows regarding persistent conditions:

The conditions which lead to the removal of the children still exist and, in all likelihood, would continue to cause the children further abuse or neglect. The parent and child relationship have [*sic*] greatly diminished. The parents['] continual neglect of the children's physical, medical, mental health and educational needs has continued. The environmental condition of the children's home was unhealthy and unsafe. The parents continued to use marijuana. The parents have not completed recommendations in order to return the children to the home. Those recommendations incomplete being: adequate housing, followed recommendations of their psychological evaluations, [*sic*] the father completing a psychosexual evaluation, and the father obtaining a job or securing of income.

The evidence in the record clearly and convincingly supports the trial court's conclusion that termination for persistence of conditions is warranted. The parents have not taken advantage of potential financial, medical, and mental health assistance that may have helped them get closer to some semblance of stability. They did not follow recommendations by health care professionals to help them. Their lack of suitable housing has persisted; more than a year and a half after the children were removed for living in a dangerous and unhealthy residence, Mother and Father were residing in an automobile. We affirm the trial court's decision on this ground.

### (E) Mental Incompetence to Parent

Tennessee Code Annotated section 36-1-113(g)(8)(B) provides that

> The court may terminate the parental or guardianship rights of [a parent] if it determines on the basis of clear and convincing evidence that:
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
> (ii) That termination of parental or guardian rights is in the best interest of the child[.]

No willfulness in the parent's failure need be shown to satisfy this ground. Tenn. Code Ann. § 36-1-113(g)(8)(C). "The General Assembly has determined that a parent's inability to adequately care for and supervise a child constitutes a just basis for termination of parental rights, even though such inability is not the result of willful conduct by the parent." *In re Samuel R.*, No. W2017-01359-COA-R3-PT, 2018 WL 2203226, at *8 (Tenn. Ct. App. May 14, 2018) (citing *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at *7 (Tenn. Ct. App. Apr. 21, 2004)). Our Supreme Court has recognized that were this not the rule, "[a]n obvious result [would be] to condemn a child, whose parents are unfit to properly care for the child because of mental illness, to a life in serial foster homes without any possibility of a stable, permanent home." *State, Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

"The statute serves to protect children from harm caused by a parent who is incapable of safely caring for them." *Id.* (citing *In re Lena G.*, No. E2016-00798-COA-R3-PT, 2017 WL 2304448, at *25 (Tenn. Ct. App. May 26, 2017)). The question is therefore "whether the child would be able to safely live with the parents." *Id.* (citing *State Dep't of Children's Servs. v. Oliver*, No. M2007-00844-COA-R3-PT, 2007 WL 4553036, at *8 (Tenn. Ct. App. Dec. 26, 2007)). For this ground, it is insufficient to show only that a parent suffers from mental incompetence; rather, "the real issue is whether this impairment adversely affects [the] ability to parent[.]" *In re C.C.*, No. E2016-00475-COA-R3-PT, 2016 WL 5266669, at *13 (Tenn. Ct. App. Sept. 22, 2016); *see also In re Quadayvon H.*, No. E2016-00445-COA-R3-PT, 2016 WL 7340427, at *8 (Tenn. Ct. App. Sept. 30, 2016) ("The issue in this case is not whether Father has impaired cognitive functioning. Rather, the issue is whether his impairment adversely affects his ability to parent his children.").

During the time just prior to DCS's intervention and the children's removal, the living conditions provided by the parents to the children were, in the trial court's words, "horrendous." Their bedroom had a broken window and was roughly the same temperature as outside. The house was filthy and dangerous. The children's beds were "covered in filth and feces." The trial court further found:

Orian . . . was sent to school repeatedly unkempt with dirty hair, that was greasy, matted and infested with lice. She was sent to school with the same dirty clothes on several days in a row. She was also sent to school with dirty men's shoes way too big for her and even ice skates with the blades removed and cardboard put on the bottoms.

The Mother was called to come pick [Orian] up from school on more than one occasion, because she was sick and needed to go to the doctor. The Mother would refuse to come pick the child up and would either make excuses why she couldn't come pick her up or just refuse and tell the school to send her home by the bus.

The parents did not properly medicate [Orian]. They would let her prescriptions deplete and not refill them or just not go pick them from the pharmacy, although they had TennCare and it was of no expense to the parents.

[Orian] would either be combative or unable to stay awake at school. She would fall asleep in a fetal position at her desk and would be in such a deep sleep she would urinate on herself. The parents when contacted would never come to school to address these issues.

Orian threatened to harm herself at school. She was evaluated at a mental hospital in May of 2018. The parents were given information and paperwork in order for a community-based mental health provider to help with Orian's mental health. The parents did not complete the necessary forms for Orian to receive any mental health treatment for her mental health issues.

When observed in the home by the caseworkers, [Edwin] was dirty. When the caseworker went to visit Edwin at school he was dirty and complained that his throat and mouth hurt. The caseworker upon observing inside Edwin's mouth, noticed he had numerous cavities and deterioration of teeth. [Edwin] had ongoing health issues at school and the parents would refuse to come pick him up. They would tell school officials to send him home by the bus.

The parents did not get the children the medical or mental attention they needed. The parents let the children fall behind emotionally and intellectually. The parents did not work and were unable to provide for the children.

(Numbering in original omitted; paragraphs reformatted). The children had unaddressed medical and dental needs when DCS took them into custody. The oldest daughter, Breanna, had a leg injury that had gone untreated so long that it required surgery and was not completely fixable. The trial court aptly characterized the situation as "severe neglect."

Against this backdrop, when Father was asked at trial whether, "prior to DCS in Tennessee removing the children . . . do you feel like you had always been able to provide for them?" he responded, "yes." Father testified that he "has medical issues," but because he has short-term memory loss, he can't remember them all. He stated that he has bronchial asthma, thyroid issues, and chronic severe depression. Father said that he is legally blind and unable to walk very far or for very long. He cannot read or write. At the time of trial, when asked whether Father was receiving medical treatment, he said, "no, I ain't got no insurance."

Jeffery Scott Herman, a senior psychological examiner and licensed professional counselor, testified that he conducted psychological evaluations and parenting assessments on both parents. He diagnosed Father with a major depressive disorder, a specific learning disorder in reading, and "a provisional diagnosis of somatic symptoms disorder," which manifested as "impairment in short-term memory that was not explainable by a general intellectual deficit." Mr. Herman stated, "at the time I saw [Father], he was still severely depressed and he had lost his insurance. And he was reporting a thyroid problem but couldn't get insurance to treat it." Mr. Herman said he didn't believe Father was stable enough to either maintain employment or effectively parent children. Mr. Herman opined that it was unlikely that Father would be able to assume or resume care and responsibility for children without treatment. Hypothetically, even with treatment, Mr. Herman was not optimistic about Father being capable to parent; the most positive thing he could say was "I can't say for sure that [Father] doesn't have the potential to improve" if he got needed treatment. Unfortunately, the evidence in the record, including Father's own testimony, establishes that he has been unable or unwilling to get the medical and mental health treatment that has been recommended and that he needs. We affirm the trial court's judgment terminating Father's parental rights on the ground of mental incompetence.

Mr. Herman testified that Mother "was intellectually disabled with congruent limitations in academic and adaptive functioning." Her full-scale IQ test yielded a score of 64. She was marginally literate, able to read at about a fifth-grade level. Mother has been receiving disability assistance and incapable of gainful employment for a long time. Mr. Herman stated that because of Mother's "limited comprehension and overall cognitive functioning . . . her mental condition was so impaired that it would be unlikely that she would be able to assume or resume the care of and responsibility for the children in the near future." In his view, the level of assistance required to enable her to safely and effectively parent the children is simply not available. The level of care−or lack thereof− of the children provided by Mother before DCS intervention is informative to our inquiry

16

here, because Mother has also been unwilling or unable to avail herself of help to improve her condition and situation. We affirm the trial court's decision that the ground of mental incompetence has been shown with regard to Mother.

### F. Failure to manifest an ability and willingness to assume custody

Tennessee Code Annotated section 36-1-113(g)(14) provides an additional ground for termination when

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

This ground requires clear and convincing proof of two elements. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* (citing Tenn. Code Ann. § 36-1-113(g)(14)). The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

As to the first element, our Supreme Court has held that the statute requires "a parent to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *See In re Neveah M.*, 614 S.W.3d 659, 677-78 (Tenn. 2020) (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280 at *13 (Tenn. Ct. App. June 20, 2018)). Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Regarding the second element of this ground, whether placing the child in the person's custody would "pose a risk of substantial harm to the physical or psychological welfare" of the children, we have previously explained:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While

17

the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Greyson D.*, No. E2020-00988-COA-R3-PT, 2021 WL 1292412, at *8 (Tenn. Ct. App. Apr. 7, 2021) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)) (footnotes omitted).

The trial court found that both parents failed to manifest both the ability and willingness to assume custody of the children. In reviewing these findings, we bear in mind that "manifesting an ability and willingness to assume legal and physical custody of a child must amount to more than mere words." *In re Ken'bria B.*, No. W2017-01441-COA-R3-PT, 2018 WL 287175, at *10 (Tenn. Ct. App. Jan. 4, 2018). Much of what we have already discussed in sections IV(A-E) above, in reviewing the first five grounds for termination, is also pertinent to our analysis of this ground as well, and we need not repeat it here. To briefly summarize, the parents did not provide for many of the children's basic needs while they were in the parents' custody, to the extent characterized by the juvenile court and trial court as severe neglect. There is no evidence that the parents have been able to effectuate a change of their circumstances that would suggest any possibility of their being able to take care of the children at the time of trial. Both parents admitted that they have no home for the children because they were residing in a car. Returning the children to them under these circumstances would not only pose a risk of substantial harm to them, but also is practically impossible. We affirm the trial court's decision that the parents have failed to manifest the ability and willingness to assume custody.

## G. Best Interests of Children

In addition to proving at least one statutory ground for termination, a party seeking to terminate a parent's rights must prove by clear and convincing evidence that termination is in the children's best interests. *See* Tenn. Code Ann. § 36-1-113(c). "[A] finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187 (Tenn. Ct. App. 2004)). This is because our termination statutes recognize that "not all parental conduct is irredeemable[,]" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The focus of the best interest analysis is not the parent but the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interest must be viewed from the child's, rather than the parent's, perspective.").

At the time DCS filed its petition, Tennessee Code Annotated section 36-1-113(i) provided nine factors[8] for analyzing best interests:

---

[8] The General Assembly subsequently amended the best interest factors at Tenn. Code Ann. § 36-1-113(i). The most recent version of the statute includes twenty enumerated factors and became effective on July 1, 2021.

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

This list is non-exhaustive. *In re Marr*, 194 S.W.3d at 499. "Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent." *Id.* "The relevancy and weight to be given each factor depends on the unique facts of each case." *Id.* "Thus, depending upon the circumstances of a particular

19

child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 877).

In this case, as already discussed at length above, the parents have not made an adjustment of their living conditions that would make it safe for the children to return to their custody, notwithstanding the reasonable efforts clearly made by DCS and other social service agencies to help them. Tragically, there is no home available to which the children could return. The trial court, considering among other things the parents' history of severely neglecting the children's most basic needs, found "there is overwhelming proof that it would be severely detrimental to the children to place them back with the parents."

The condition of the children has generally improved since their removal. Ms. Brown testified that Diamond received mental health treatment and counseling, and has made great improvements since being in foster care. Diamond, who turned eighteen years old in December of 2021, was reported as making straight As in school and looking forward to college. Ms. Brown stated that Diamond had developed a strong bond with her foster parents.

Orian had comparatively more challenging and serious mental health needs. She went to a 30-day inpatient acute care facility, where she was diagnosed with PTSD, trauma, and ADHD. Orian was then transferred to a facility at Mountain Youth Academy. She has received treatment for issues regarding self-harm and smearing of blood and feces on herself and others, and other aggressive behavior. Orian's health care professionals have provided her with counseling and other therapeutic treatment, monitored her mental health and medications, and done ongoing psychological evaluations. Ms. Brown testified that in this setting, "she has done much better."

When Edwin was removed from the parents' home, he also had problems with both aggressive and self-harming behavior, and a tendency to urinate in inappropriate places and on other people. Edwin went through seven different foster home placements, and according to Ms. Brown's testimony, he is doing "wonderfully" in his current placement:

> [Edwin's] mental health treatment that is in home has been moved just to outpatient. He sees them less. He does have an in-home case management with that therapeutic interventions, as well. But behavior-wise, he has coping skills now that he can tell you when he's angry. His school has improved, his educational developmental has improved. He's still in a tier process but he is making, he's making good progress on that.

Edwin's current caseworker also testified that his behavior and condition has improved dramatically. Edwin's current foster mother testified that he has talked to her about his life before foster care, stating:

20

He would talk about how his father would punch him. I know he said that he would, he drug him across the floor with a hoodie, with his hoodie. He would spank him with his belt with the metal rings in it. He saw his father punch his mom. He would talk about somebody burning him with cigarette butts, his sister scratching him on the private area, just having to help his mom do stuff and having to cook his food on his own[,] stuff like that.

Edwin's foster mother said that he "is happy being around" them, that "he's, you know, bonded with us, and like I said, he's, to us, he's our son." She testified that if Edwin were available for adoption, their "home would be a preadoptive home." Considering the record before us in light of the statutory factors and the totality of the circumstances, we have no difficulty affirming the trial court's judgment that termination of the parents' rights is in the best interest of the children.

## V. CONCLUSION

The judgment of the trial court is affirmed. Exercising our discretion, because the parents are indigent, costs on appeal are assessed to the appellee, Tennessee Department of Children's Services.

_____
KRISTI M. DAVIS, JUDGE